# EXHIBIT A

# VOLUNTARY LABOR ARBITRATION

BETWEEN:

## MONONGALIA COUNTY COAL COMPANY (MURRAY AMERICAN ENERGY)
## and
## UNITED MINE WORKERS OF AMERICA, DISTRICT 31, LOCAL NO. 1702

CASE NO. 16-31-18-059
GRIEVANTS: BRANDON KIMBLE & TRAVIS KNOTTS
CONTRACTING OUT

## OPINION AND AWARD

ARBITRATOR: THOMAS L. HEWITT
HEARING DATE: MAY 17, 2018
AWARD: JUNE 15, 2018

VIA EMAIL – HARD COPY TO FOLLOW

### APPEARANCES

| FOR THE COMPANY | | FOR THE UNION | |
|---|---|---|---|
| KENNETH R. ELLER | MANAGEMENT CONSULTANT | DENNIS FRYE | UMWA REPRESENTATIVE DISTRICT 31 |
| SCOTT BOYLEN | GENERAL MANAGER MONONGALIA COUNTY COAL CO. | SHAWN SIMPSON | LOCAL 1702 PRES. (w) LOCAL COMMITTEEMAN |
| TIM BAUM | ASST. TO HUMAN RESOURCES MGR. MONONGALIA COUNTY COAL CO. | BRANDON KIMBLE TRAVIS KNOTTS | GRIEVANT (w) GRIEVANT (w) |
| JIM TRAVELSTEAD | HUMAN RESOURCES SUPERVISOR | JAMES PONCEROFF | MINE COMMITTEE CHAIRMAN |
| BRADY WEST | HUMAN RESOURCES COORDINATOR | JEFF REEL | LOCAL COMMITTEEMAN |
| DALLAS CROSSMAN | SPECIAL PROJECTS COORDINATOR MURRAY AMERICAN ENERGY | RYAN LEMLEY | LOCAL COMMITTEEMAN |
| | | MIKE CONNER | LOCAL COMMITTEEMAN |
| | | MIKE CAPUTO | INTERNATIONAL VICE-PRES. |

| | | |
|---|---|---|
| Monongalia County Coal Co.<br>(Murray American Energy)<br>United Mine Workers of America<br>District 31, Local No. 1702 | Case No. 16-31-18-059 | Thomas L. Hewitt, Arbitrator<br>June 15, 2018 |

# PERTINENT CONTRACT LANGUAGE

## NATIONAL BITUMINOUS COAL WAGE AGREEMENT OF 2016
### Article I - ENABLING CLAUSE

THIS AGREEMENT made this **15th day of August, 2016,** between the coal operators and associations signatory hereto, as parties of the first part (each coal operator which is a signatory hereto being called "Employer") and the International Union, United Mine Workers of America (hereinafter called "Union"), on behalf of each member thereof, as party of the second part, covers all of the bituminous coal mines described in Article IA, Section (f), owned or operated by said first parties. This Agreement carries forward and preserves the terms and conditions of all the various District agreements executed between the United Mine Workers of America and the various operators and coal associations subject to the terms and conditions of this Agreement and as amended, modified and supplemented by this Agreement as herein set out.

This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement. Immediately upon the conclusion of such sale, conveyance, assignment or transfer of its operations, the Employer shall notify the Union of the transaction. Such notification shall be by certified mail to the Secretary-Treasurer of the International Union and shall be accompanied by documentation that the successor obligation has been satisfied. Provided that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

WITNESSETH: It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement. It is agreed that at operations covered by this Agreement the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the Employees of the parties of the first part. It is further agreed that as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law, except in those exempted classifications of employment as hereinafter provided in this Agreement. This provision does not change the rules or practices of the industry pertaining to management. The Mine Workers intend no intrusion upon the rights of management as heretofore practiced and understood. It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement. Management will not abridge the rights of the Employees as set forth in this Agreement.

Monongalia County Coal Co.         Case No. 16-31-18-059        Thomas L. Hewitt, Arbitrator
(Murray American Energy)                                                                                             June 15, 2018
United Mine Workers of America
District 31, Local No. 1702

## Article IA - SCOPE AND COVERAGE

### Section (a) Work Jurisdiction

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

### Section (d) Management of the Mines

The management of the mine, the direction of the working force and the right to hire and discharge are vested exclusively in the Employer.

## Article XX - HEALTH, RETIREMENT AND OTHER BENEFITS

### Section (d) Contributions by Employers

(1) During the life of this Agreement, for the periods of time indicated below, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

(i) Into the 1974 Pension Trust: for the period beginning on August 15, 2016 and ending when this Agreement is terminated, $5.00 per hour on each such hour worked, other than on hours worked by a New Inexperienced Miner hired on or after January 1, 2012; provided, however, that if legislation takes effect with regard to pension provisions similar to those in S.B. 1714 and H.R. 2403, the rate of contribution by Employers shall increase to $5.50 per hour.

(ii) Into the 1993 Benefit Trust: for the period beginning on July 2, 2016 and ending when this Agreement is terminated, 50¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code.

(iii) Into the 2012 Retiree Bonus Account Trust for the period beginning on the Effective Date and ending September 30, 2016 or prior to that date upon written certification from the Trustees of the 2012 Retiree Bonus Account Trust that funding is sufficient to pay the 2016 one-time single sum bonus payment, $1.50 per hour on each such hour worked, provided however that signatory Employers shall not be required to increase their rate of contribution to the Trust under any circumstances, regardless of the financial condition of the Plan.

Monongalia County Coal Co.  Case No. 16-31-18-059  Thomas L. Hewitt, Arbitrator
(Murray American Energy)  June 15, 2018
United Mine Workers of America
District 31, Local No. 1702

### (3A) NEW INEXPERIENCED MINERS HIRED AFTER 1/1/2012

A New Inexperienced Miner hired on or after January 1, 2012 will not earn vesting service, signatory service or credited service from the 1974 Pension Plan. Such a New Inexperienced Miner shall receive monthly Enhanced Premium Contributions and Supplemental Pension Contributions from his Employer to the United Mine Workers of America Cash Deferred Savings Plan of 1988, as described in Article XXB(d)4 and Article XXB(d)5 of this Agreement.

### Article XXB - UMWA CASH DEFERRED SAVINGS PLAN OF 1988

#### Section (a) General Purpose

This Article provides for the maintenance of a pension plan and trust for Employees covered by this Agreement, separate and apart from those maintained pursuant to Article XX of this Agreement known as the United Mine Workers of America Cash Deferred Savings Plan of 1988. This Savings Plan shall provide additional retirement income to Employees and their dependents, and shall be funded by voluntary wage deferrals, enhanced premium contributions (the "Enhanced Premium Contributions") and supplemental pension contributions (the "Supplemental Pension Contribution") made by Employers, and, as necessary, Employer contributions to pay the cost of administration.

#### Section (b) Trust

The Savings Plan shall be maintained through an irrevocable trust, created pursuant to Section 302(c) of the Labor Management Relations Act of 1947, and qualified under Section 501(a) of the Internal Revenue Code of 1986 ("IRC"), or any successor statute.

#### Section (c) Plan

The Savings Plan shall be maintained in accordance with the requirements of Section 401(k) of the IRC, and is intended to be qualified under Section 401(a) of the IRC.

#### Section (d) Funding

5. A New Inexperienced Miner hired on or after the January 1, 2012 shall receive Supplemental Pension Contributions from the Employer to the Savings Plan based on hours worked as follows:

| Term of Agreement | Amount Per Hour Worked |
|---|---|
| 2016 through 2021 | $1.50 |

Any such New Inexperienced Miner will not earn any vesting, credited or signatory service from the 1974 Pension Plan.

3

Monongalia County Coal Co.  Case No. 16-31-18-059  Thomas L. Hewitt, Arbitrator
(Murray American Energy)  June 15, 2018
United Mine Workers of America
District 31, Local No. 1702

### Article XXIII - SETTLEMENT OF DISPUTES

#### Section (e) Earnest Effort to Resolve Disputes

An earnest effort shall be made to settle differences at the earliest practicable time. Where an Employee makes a complaint during work time, the foreman shall, if requested to do so, and if possible, consistent with continuous production, discuss the matter briefly on the spot.

At all steps of the complaint and grievance procedure, the grievant and the Union representatives shall disclose to the Employer representatives a full statement of the facts and the provisions of the Agreement relied upon by them. In the same manner, the Employer representatives shall disclose all the facts relied upon by the Employer.

#### Section (g) Right of Grievant to be Present

The grievant shall have the right to be present at each step of the grievance procedure until such time as all evidence is taken.

#### Section (h) Finality of Decision or Settlement

Settlements reached at any step of the grievance procedure shall be final and binding on both parties and shall not be subject to further proceedings under this Article except by mutual agreement. Settlements reached at steps 2 and 3 shall be in writing and signed by appropriate representatives of the Union and the Employer.

## BACKGROUND

The Monongalia County Mine is a large bituminous coal mine which straddles the border of West Virginia and Pennsylvania. The mine was originally opened by the Consolidated Coal Company (Consol) in the 1970s, and was known as the Blacksville No. 2 Mine. At the time of the filing of the instant Grievance, the mine employed approximately 282 bargaining unit employees, represented for collective bargaining purposes by the United Mine Workers of America ("UMWA"), Local Union 1702, and governed by the National Bituminous Coal Wage Agreement of 2016 ("NBCWA").

## STATEMENT OF FACTS

On Sunday, February 25, 2018 six (6) contractor's employees worked eight (8) hours each building wooden cribs. There were four (4) classified employees working in the area and when one of the employees finished his assignment of retrieving cable, he joined the contractor's employees for at least four (4) hours in their building of these wooden cribs. Two employees had volunteered for Sunday work and were performing assigned work out of their classification until assigned the building of the wooden cribs.

As the result of the employees' claims that the contractor's employees performed their classified work of building cribs, the following Grievance was properly filed and processed to arbitration:

Monongalia County Coal Co.        Case No. 16-31-18-059        Thomas L. Hewitt, Arbitrator
(Murray American Energy)                                                                            June 15, 2018
United Mine Workers of America
District 31, Local No. 1702

---

Grievance No. 1702-13-18

Name of Grievants: Brandon Kimble       Name of Employer: Mon. County Coal Employer
                   Travis Knotts
UMWA Local Union 1702    District 31         Mine: Mon. County Coal Mine

The Grievance: Mine management is in violation of Article IA of the 2016 NBCWA and any and all that may apply. On or about 2-25-18 management had 6 contractors 8 hrs each building cribs. Classified men have allways [sic] done this work there is Articles in the contract that managements fails to use to staff the coal mine seven days a week. Grievants demands [sic] 48 hrs of double time rate of pay and for this practice to cease and desist and be made whole in all ways.

/s/ Travis Knotts                                    Date: 2/28/18
/s/ Brandon Kimble

---

A full, fair and complete arbitration hearing was held on May 17, 2018, at the Holiday Inn Express in Fairmont, West Virginia. All witnesses were sworn, the hearing was taped by the Arbitrator, all parties were afforded the opportunity to present evidence and testimony, call, examine and cross-examine witnesses, make opening and closing statements, submit authority, state positions, make comments and arguments and submit exhibits.

## UNION POSITION

On February 25, 2018, the Employer used contracted employees to perform the classified work of building cribs to support the roof in the mine. This is quite different than contracting out pumpable columns, which were new products over which no work jurisdiction had been established. Thus, *res judicata* is not applicable. In this case, the work does not require any new knowledge as it has been performed only by classified employees.

This is not only "*work of the type*", it is work that has been performed only by classified employees for at least the past fifty (50) years.

The fully employed provision of the Agreement is not applicable. The Employer provided no documentation that a contractor has ever built these cribs. In all other cases the Employer eagerly submitted invoices to support their claim that contractors had previously performed the work involved.

This was not an emergency or even claimed as such and this work could have been performed during the week. This is the blatant assignment of classified work being contracted out. This mine had employed over 400 classified employees, however, as a result of layoffs, only 282 employees and numerous contractors are performing the lost classified work.

## EMPLOYER POSITION

The Employer did not violate any of the terms and conditions of the NBCWA when it utilized contracted employees to construct a permanent "supplemental roof support" that was required under the mandated Roof Control Program. Both primary and supplemental roof supports are essential and there is a myriad of types of roof support systems using various types of materials and styles of construction that have been installed by

5

Monongalia County Coal Co.         Case No. 16-31-18-059        Thomas L. Hewitt, Arbitrator
(Murray American Energy)                                                                         June 15, 2018
United Mine Workers of America
District 31, Local No. 1702

contractors. In addition to this type of crib there are cans, pizza jacks, steel sets, arches and other similar supplemental supports constructed after the coal is removed that are installed by contractors. Roof support systems all perform the same function, which is to use weight-bearing materials to support and make the roof safe.

In ARB 78-24, a grievance found to be between the same parties, at the same operation, on the same fact situation, and involving the same issues of contract interpretation and application as present in the former grievances decided by the prior award is *res judicata.* In this case, it is the same parties, (UMWA & Monongalia Mine), the same operation (Monongalia Mine), the same fact situation, (the construction of supplemental roof supports), and the same issues of contract interpretation (Article I A (g) (2), (i) ).

It is required, under precedential ARB 78-16 Supplement, ARB 78-26 and ARB-60, that the claimants must prove they personally suffered a loss as a result of the disputed construction work. These Grievants worked seven (7) days that week and over ten (10) hours at double time on Sunday. This can hardly be considered any type of loss.

## ARBITRATOR'S OPINION

If contractors had built wooden cribs in the past, it was without Union knowledge and as a prior practice, must be open, notorious and performed a sufficient number of times so that one may expect it to continue. Therefore, there was no prior practice of contractors building the wooden cribs of the type involved in this case. It is agreed that there are a myriad type of roof support systems and each is an entity in itself, categorized differently as to work jurisdiction in different mines. Roof support in general is work *"in the production of coal"* but has been treated differently by different arbitrators.

A.     The Employer determines the size of the work force.
B.     The Employer determines the work to be performed.
C.     The Employer determines the scheduling of that work.

An Employer who regulates/reduces the size of the workforce and assigns work that is unable to be performed within its self-imposed time limit if it uses only its current fully employed classified employees creates an **"impossibility of performance"** situation. If this Employer then relies upon Article A I, subsection (i) as authority to utilize sub-contractors to perform work customarily performed by classified employees, the Employer is circumventing the intent of the contract under Article I. This use of abuse of authority cannot then be relied upon as a reason to permit the use of outside contractors even when all classified employees are fully employed working no less than five (5) days a week, Obviously, this is not the intent of the drafters of the contract and this self-imposed scheduling may not be used to circumvent the intent and purpose of the NBCWA or diminish the use of the workforce under Article I.

**Article I [excerpt]:**

> *"It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of*

6

Monongalia County Coal Co.     Case No. 16-31-18-059     Thomas L. Hewitt, Arbitrator
(Murray American Energy)     June 15, 2018
United Mine Workers of America
District 31, Local No. 1702

*persons employed in the bituminous coal mines covered by this Agreement. Management will not abridge the rights of the Employees as set forth in this Agreement."*

Position A:    Everything is the production of coal.
Position B:    Everything is construction work.

Neither of the above positions were the intent of the drafters of the NBCWA or arbitrators' decisions and the arbitrators' decisions have defined, interpreted or devised meanings to adjust both of these positions. Under Judge Keeley's definition of construction, if applied to the coal industry under Article I A, subsection (i), nearly all work is construction and consequently may be contracted out if **current** employees are fully employed and working at no less than five (5) days per week. The erroneous interpretation of Judge Keeley to define nearly all work involved under the NBCWA as mine construction that falls under I A, subsection (i), has created a severe dispute between the parties. A majority of work in the production of coal may easily be defined under this generic broad interpretation of construction and this work has been accepted under this contract as "**classified work**" since the inception of the Union in the coal industry. This classified work, which may fall under the definition of construction, is **protected classified work,** which may not be contracted out without mutual agreement. The integrity of the contract requires this; otherwise there is no meaning to the NBCWA. One the primary purposes of the negotiated NBCWA is to protect the work of the Union members.

A reasonable person with experience in the coal industry would find it unconscionable to believe that the drafters of the NBCWA would intend, or the overall expectations of the parties would be, for the interpretation of the word "*construction*" to be used to permit the work under this labor agreement to be contracted out, thereby depleting the Union's protected work and diminishing Union membership. Having had years of association through cases presented to him, this Arbitrator cannot find that Cecil E. Roberts, President of the UMWA, would ever agree to any language which would reduce the Union's work jurisdiction. Therefore, it cannot possibly be the intent of the parties to apply the word "*construction*" when the result is loss of jurisdictional, protected work to contractors.

It appears there may be a concerted effort to abridge the rights of employees by utilizing sub-contractors to perform classified work. Perhaps this is based upon an erroneous interpretation of Judge Keeley's decision that nearly all work in the mine can be considered "construction" and therefore may be contracted out if the current workforce is fully employed. There is very limited authority for a judge to overturn the facts found by an arbitrator and Judge Keeley did not modify the facts found by the arbitrator, as she found the award was not derived from the essence of the contract and imposed her own brand of industrial justice.

As the Employer stated in its Brief, quoting Arbitrator Phelan: *"Everything that goes on in a mine is related in one way or another to the production and/or processing of coal. That is what coal mining is all about. But when the contract establishes different rules to be applied to contracting out of different categories of work, the categories cannot be ignored in favor of a larger, all-encompassing category of production-related work".* The **work** in this case is a category of work germane to the production of coal, which is protected classified work at this mine and has not been subject to contracting out since it became signatory to the NBCWA. Nothing has changed to modify this understood contract application, which has been accepted by both parties for over fifty (50) years. One may not change a long-standing accepted practice, a mutually accepted contract interpretation, or the classification of the type of work, simply by changing its nomenclature.

Monongalia County Coal 16-31-18-059 -000008

| | | |
|---|---|---|
| Monongalia County Coal Co.<br>(Murray American Energy)<br>United Mine Workers of America<br>District 31, Local No. 1702 | Case No. 16-31-18-059 | Thomas L. Hewitt, Arbitrator<br>June 15, 2018 |

This Arbitrator made his findings and award based upon giving full and careful consideration to all the evidence, arguments and authorities submitted, the total record, all relevant legal decisions and contractual considerations, the specific application of contract provisions as well as the contract as a whole, existing common law of the particular workplace and industry and other pertinent circumstances, statements and arguments thereon.

A contractual violation requires a remedy; since this is found to be protected classified work and is not **construction work per se,** the exception granted under Article 1 A, subsection (i) *"...Employees with necessary skills to perform the work are working no less than five (5) days..."* is therefore not applicable.

## FINDINGS

This case fails to meet all the elements necessary to invoke *res judicata* as this is not the same situation or type of roof support. The roof support involved in Judge Keeley's decision involved a **never-before-used** pumpable bag (chemical) system. The type of wooden crib roof support work at this mine has never before been performed by anyone but classified employees, has never before been performed by contractors and is therefore protected classified work. It is not a new system and has been used at this mine for years, which creates a protected prior practice, and there has been no change that would modify this long-accepted interpretation of the contract involving this work.

The Employer violated Article I and IA, subsection (a) as the building of wooden cribs is work closely associated with the production of coal that has exclusively been performed by classified employees, therefore, it is a contractually-protected activity and not *construction work per se*, which falls under Article I A, subsection (i). The four Grievants lost the opportunity to perform this protected classified work.

**Relief:** Six (6) contractors worked for eight (8) hours each, for a total of forty-eight (48) hours. Divided equally, twelve (12) hours shall be paid to each of the four (4) classified employees working on that shift at each employee's regular rate of pay.

## AWARD

**The Grievance is granted.**

**Relief:** Six (6) contractors worked for eight (8) hours each, for a total of forty-eight (48) hours. Divided equally, twelve (12) hours shall be paid to each of the four (4) classified employees working on that shift at each employee's regular rate of pay.

Issued at Latrobe, Pennsylvania, this 15th day of June, 2018.

*Thomas L. Hewitt*
Thomas L. Hewitt, Arbitrator

8